Coleman v. Farrar.

COLEMAN, *Guardian, Appellant*, v. FARRAR, *Administrator.*

### In Banc, November 14, 1892.

1. **Guardian of Lunatic:** VALIDITY OF INQUISITION: ESTOPPEL. One, who files an information in the probate court charging another's insanity, receives appointment as his guardian, gives bond and takes charge of his estate, is thereafter estopped to deny the validity of the proceeding adjudging the insanity of his ward.

2. **Probate Court:** DEATH OF LUNATIC: GUARDIAN'S SETTLEMENT. The probate court on the death of the ward has jurisdiction to render final judgment settling his accounts.

3. ———: ———: ———: NOTICE. The probate court has the authority to direct notice to be given of such final settlement, although none is expressly required by the statute.

4. ———: ———: ———: ———. Where, however, the parties in interest are before the court, the question of notice is immaterial.

5. ———: ———: ———: APPEAL. An appeal will lie from the judgment of the probate court settling the accounts of the guardian of a lunatic rendered on the death of the ward.

6. **Lunatic:** TRANSACTION OF BUSINESS: STATUTE. A guardian of a lunatic is not authorized, under Revised Statutes, 1889, section 5542, to permit his ward to transact his business, as if sane, nor can those having notice of the adjudication of lunacy, even with the consent of the guardian, trade with the ward without limitation.

*Appeal from Johnson Circuit Court.*—HON. C. W. SLOAN, Judge.

AFFIRMED.

*S. P. Sparks* for appellant.

(1) Though by the constitutional provisions of section 34, article 6, Constitution of 1875, it was intended to clothe probate courts with the powers ascribed to it in this class of cases, nevertheless, it was

dormant until vitalized by legislation essential to its proper exercise. *Fusz v. Spaunhorst*, 67 Mo. 256; *People v. Loomis*, 96 Ill. 377. (2) Before the probate court could exercise the jurisdiction, to render a judgment of any binding force as a finality, it was essential that some sort of notice should have been provided for by law to the parties interested in the estate, and such notice must have been served in the mode pointed out. *Earle v. McVeigh*, 91 U. S. 503; *Borden v. Fitch*, 15 Johns. 141; *Speldon v. Newton*, 3 Ohio St. 494; Freeman on Judgments [3 Ed.] sec. 118. (3) A publication made in the absence of any statute authorizing it is the same in effect as no publication; a judgment based upon it is void. *Shields v. Miller*, 9 Kan. 390; Freeman on Judgments, sec. 127. (4) The appearance of the administrator possessed no legal significance. It could not change the nature of the proceedings from an *ex parte* to an adversary character. 1 Woerner on Law of Administration, sec. 142; *Zoll v. Soper*, 75 Mo. 460. (5) The employment of the term jurisdiction in the constitution (if self-enforcing) cannot be construed to mean that its orders and judgments in every case are necessarily final and conclusive, without regard to the nature of the proceeding. *Gordon v. Eans*, 97 Mo. 587. (6) The binding effect of a final settlement rests upon the notice and proclamation to all parties interested in the estate to come forward and make known their objections; these notices constitute the process to the ward; without this notice it has only the form and effect of an *ex parte* proceeding. *Picot v. Biddle*, 35 Mo. 29; *Fenix v. Fenix*, 80 Mo. 27; *North v. Priest*, 81 Mo. 561; *State ex rel. v. Haster*, 61 Mo. 544; *State ex rel. v. Roeper*, 82 Mo. 57; *Brashears v. Hicklin*, 54 Mo. 102. Before the probate court could acquire jurisdiction of the question of Ashby's insanity it was essential that he should have been notified or appeared

to the action. *Crow v. Meyerseick,* 88 Mo. 411; *Windsor v. McVeigh,* 93 U. S. 277; *United States v. Arredondo,* 6 Pet. 709; *Sheldon v. Newton,* 3 Ohio St. 495; Revised Statutes, 1879, sec. 5789.

*W. W. Wood* for respondent.

(1) The proceedings of the probate court on the adjudication of insanity were not introduced in evidence, and, hence, appellant cannot be heard upon jurisdiction of the probate court on such adjudication. (2) Appellant by filing the information accepting the appointment, etc., is estopped to deny the validity of the insanity inquisition. *Dutcher v. Hill,* 29 Mo. 271; *Fox v. Minor,* 32 Cal. 111; *People v. Norton,* 9 N. Y. 179; *Mississippi Co. v. Jackson,* 51 Mo. 23; *Adair v. Adair,* 78 Mo. 630. (3) The probate court having spread upon its records the reason why notice or attendance was not required, the law was strictly complied with, although no notice was given. Revised Statutes, 1889, sec. 5515. Even in the absence of a statutory provision, it is held that a finding similar to the one made in this case is sufficient to dispense with notice. *Dutcher v. Hill, supra; In re Tracy,* 1 Paige, 580; *Hutts v. Hutts,* 62 Ind. 214; *In re Vanauken,* 10 N. J. Eq. 186. It was not necessary for the verdict to recite the exact language of the statute. *Smith v. Burnham,* 1 Aiken (Vt.) 84; *In re Russell,* 1 Barb. Ch. 38; *Bethea v. McClenan,* 1 Ire. Law, 523; *Medlock v. Cockburn,* 1 Rich. (S. C.) Eq. 477; *Campbell's case,* 2 Bland Ch. (Md.) 209, 217. (4) There is no statutory or constitutional provision providing for a trial *de novo* on appeal from the probate court to the circuit court in cases of this kind, and the cause should have been submitted on the record as prayed for by respondent. Revised Statutes, 1889, chaps. 76, 86, ch. 1, art. 14;

·ch. 46, art. 4; Constitution, art. 6, secs. 22, 23, 34; Revised Statutes, 1889, sec. 3318; *St. Louis Co. v. Sparks,* 11 Mo. 201; *Lewis v. Nuckolls,* 26 Mo. 278; *Lacey v. Williams,* 27 Mo. 280. (5) The death of Ashby did not deprive the probate court of jurisdiction of the cause, and the first instruction was properly refused. Revised Statutes, 1889, sec. 5551; Constitution, art. 6, sec. 34. (6) All contracts made by Ashby after the adjudication of insanity were absolutely void, and appellant is not entitled to credit for money paid out thereon. Revised Statutes, 1889, sec. 5542; *Rannells v. Gerner,* 80 Mo. 474; *Hughes v. Jones,* 22 N. E. Rep. 446; *Leonard v. Leonard,* 14 Pick. 280; *Gipson v. Soper,* 6 Gray, 279; *L'Amoroux v. Crosby,* 2 Paige, 422; *Griswold v. Miller,* 15 Paige, 520; *Fitzhugh v. Wilcox,* 12 Barb. 235; *Wadsworth v. Sherman,* 14 Barb. 169; *Nichol v. Thomas,* 53 Ind. 42; *Mohr v. Tulip,* 40 Wis. 66; *Crawford v. Scoville,* 39 Am. Rep. 766; *Carpenter v. Kinley,* 83 Ind. 18; *Ins. Co. v. Blankenship,* 94 Ind. 535.

GANTT, J.—On the twenty-seventh of August, 1880, in vacation of the probate court of Johnson county, an information in writing was filed in said court, that one James L. Ashby was of unsound mind and incapable of managing his affairs. On the same day, without notice to said Ashby, and without bringing him before the court, for the reason that he was a raving maniac at the time, an inquiry was had before a jury who found that the said Ashby was "of unsound mind and a fit subject for the lunatic asylum;" thereupon the court appointed W. F. Hess "guardian of the person and estate" of said Ashby, and required him to give bond as such in the sum of $10,000. It appears from the evidence that Ashby was a merchant, farmer and trader and doing a pretty extensive business

for his locality. After the inquiry, he was taken to the asylum, where he remained but a short time; upon being discharged he returned home and resumed control of his business and continued managing his affairs until the twenty-first of July, 1884.

Hess was Ashby's father-in-law and resided with Ashby; he never qualified nor exercised any control over Ashby's business until the latter date when he gave bond, and afterwards, on the fifth of August, 1884, was killed by Ashby. Afterwards on the eleventh of August, 1884, the appellant Coleman was appointed by the probate court guardian and curator of Ashby, gave bond and took charge of his estate; had the same inventoried and appraised and proceeded in the discharge of the duties of a guardian and curator of an insane person, as to such estate.

Afterwards Ashby died, and respondent Farrar was appointed administrator of his estate, and, afterwards, on the twenty-third of August, 1886, the said Coleman filed in said court a statement of his account as guardian and curator of the estate of said Ashby, showing that the total amount of the assets of said estate that came into his hands was the sum of $10,535; and that of such assets he had then in his hands uncollected notes and accounts amounting to the sum of $5,052.74; that he had realized in cash from such assets the sum of $5,460.53, and that he had disbursed on account of said estate, as per voucher filed therewith, the sum of $6,489.55. Upon examination of said statement, the probate court found the statement correct as to the amount of the uncollected notes and accounts and gave him credit therefor; but found him entitled to credit for disbursements only to the amount of $2,501.82, leaving a cash balance due from him to the estate of $2,980.45, which amount the court ordered him "to pay over to the administrator of the estate of the said James

Ashby, deceased, and to take his receipt for same, and that he turn over to said administrator the uncollected assets."

From this order Coleman appealed to the circuit court in which court Farrar, the administrator, appeared for the first time, so far as this record shows, and moved that the judgment of the probate court be affirmed upon the record, which motion being overruled, the case was tried *de novo*, and the account restated by the circuit court; the court finding the amount of total assets and uncollected notes and accounts to be correct as stated in the original account; that the amount of cash received by the guardian was $5,482.26; that the amount of credits to which he was entitled for disbursements was $2,845.46, leaving a balance due the estate of $2,636.80, and thereupon ordered said guardian to turn over to said Farrar, administrator, the uncollected notes and accounts and rendered judgment in favor of the administrator against said guardian for said sum of $2,636.80 with six per cent. interest from the twenty-third day of August, 1886. From this judgment the guardian appeals to this court.

Of the disbursements for which the guardian claimed credit the probate court disallowed the sum of $3,987.73, and the circuit court disallowed the sum of $3,644.09. The particular items disallowed by the circuit court are set out in the account stated by said court and consist of five vouchers disallowed, in whole, amounting to the sum of $2,290.32, and five vouchers disallowed in part, to the amount of $953.77, and $400 of the credit of $1,000 allowed by the probate court for services as guardian.

The main controversy is upon the disallowance of the credits claimed as per the ten vouchers, which were obligations contracted by Ashby after the inquiry

of lunacy aforesaid and before Coleman qualified as guardian, and which were paid by him before the death of said Ashby.

It appears from the instructions given and refused that the circuit court in adjusting the account proceeded upon the theory that the debts incurred by Ashby after the inquiry of lunacy, and paid by the guardian, Coleman, except so far as they were incurred for necessaries for the support of Ashby and his family, were absolutely void, and that the guardian by paying them acquired no right to a credit for such payment in his account.

The other facts will appear in the further discussion of the case.

I.  The appellant having filed an information in the probate court alleging that Ashby was insane, and having accepted an appointment as guardian of said Ashby and entered into a bond for the faithful administration of his estate, and having received into his hands a large estate by virtue of his appointment from said court, is estopped from denying the validity of the proceedings in said court, adjudging said Ashby insane.  *Dutcher v. Hill*, 29 Mo. 271; *Austin v. Loring*, 63 Mo. 19; *Adair v. Adair*, 78 Mo. 630.

II.  Preliminary to the examination of the exceptions of the appellant to the rulings of the circuit court, as to the disallowance of certain credits claimed by the guardian in his account, it is important that we determine whether the probate court of Johnson county had jurisdiction to make a final settlement with the guardian of the lunatic, that would have the effect of a final judgment, and be conclusive between the parties interested and concerned therein at law. A careful investigation of the legislation on the subject will suggest many difficulties.  The statute of 1825, section 13, page 434, provided that, when any person who had

been adjudged insane should show to the probate court that he had been restored to his right mind, he should be discharged from custody, and the guardian should immediately settle his accounts, "and in case of the death of any such person, his estate shall descend, and be disposed of, in the same manner as if he were sane; and the guardian shall immediately render his accounts and make final settlement."

And section 15 vests in said courts full power to control the guardian in the management and settlement of said estates, and enforce its judgments "in the same manner as a court of chancery may or can do."

By section 44 of the chapter entitled "insane persons," of the Revised Statutes, 1835, it was provided: "The county courts, respectively, shall have full power to control the guardian of any such insane person in the management of the person and estate, and the settlement of his accounts, and may enforce and carry into execution their orders, sentences and decrees, in the same manner as a court of chancery," and by section 15, page 156, under the chapter entitled "courts," of the Revised Statutes of 1835, jurisdiction is given the county courts to appoint guardians of insane persons and award the necessary process. In the revision of 1845, section 44 of Revised Statutes, 1835, remains unchanged in its number or in word, and the powers of the county court are the same in the general grant of jurisdiction.

In the revision of 1855, section 44 of the previous revisions is retained in these words: "The county court shall have full power to control the guardian of any such insane person in the management of the person and estate and the settlement of his accounts, and to enforce and carry into execution their orders, sentences and judgments."

The General Statutes of 1865 retained section 44 exactly as it stood in the revision of 1855, and it was carried forward in the same words into Wagner's Statutes of 1872. The jurisdiction vested in the county and probate courts was conferred by the legislature, by virtue of the power granted in the constitutions of 1820 and 1865. When the convention met in 1875, to frame a new constitution for the state, as is well known, it found the jurisdiction in probate matters in great confusion. In many counties the county courts continued to exercise the jurisdiction conferred in the general statutes, but in many of the more populous counties probate courts had been established by special acts, each having its own peculiar powers.

Wisely considering that there should be a uniform system of probate courts, the convention provided by section 34, article 6, of the constitution that "the general assembly shall establish in every county a probate court, which shall be a court of record, and consist of one judge, who shall be elected. Said court shall have jurisdiction over all matters pertaining to probate business, to granting letters testamentary and of administration, the appointment of guardians and curators of minors and *persons of unsound mind*, settling the accounts of executors, administrators, curators and guardians and the sale or leasing of lands by administrators, curators and guardians; and also jurisdiction over all matters relating to apprentices; *provided*, that until the general assembly shall provide by law for a uniform system of probate courts, the jurisdiction of probate courts heretofore established shall remain as now provided by law."

In pursuance of this mandate, the legislature at its first session in 1877 established in the city of St. Louis and in every county in the state a probate court, with the jurisdiction conferred by the constitution

(Laws, 1877, sec. 1, p. 229), and further provided that said probate courts in the exercise of their jurisdiction shall be governed by the statutes in relation to administration, to guardians and curators of minors and persons of unsound mind, and to apprentices, and by such laws as may be enacted, defining and limiting the practice in said courts. (Laws, 1877, sec. 14, p. 231.)

In the revision of 1879, section 44 of the revisions of 1855 and 1865, *supra*, is omitted, nor does it appear in the Revised Statutes of 1889.

In the Revised Statutes, 1879, are the following provisions:

"Sec. 5815. Every guardian of an insane person shall, once a year, or oftener, if required by the court appointing him, render to such court a just and true account of his guardianship, and make settlement thereof with such court."

"Sec. 5824. If it be found that such person has been restored to his right mind, he shall be discharged from care and custody, and the guardian shall immediately settle his accounts, and restore to such person all things remaining in his hands belonging or appertaining to him.

"Sec. 5825. In case of death of any such insane person while under guardianship, the power of the guardian shall cease, and the estate shall descend and be distributed in the same manner as if such person had been of sound mind, and the guardian shall immediately settle his accounts and deliver the estate and effects of his ward to his personal representatives."

From the statement of facts it will be seen that this cause comes within the purview of section 5825, *supra*.

The position of the appellant is, briefly, that the probate court had no power to render a final judgment upon his settlement, because, *first*, the statute directing

his settlement does not denominate it a final settlement, nor confer upon the probate court the power to make or compel it; *second*, the statute does not provide for a notice to interested parties; hence, the settlement was intended to be "*ex parte*," and could not in its nature be conclusive on those interested, who were not required to be present, and had no opportunity to question its fairness; *third*, no provision for an appeal is made to the circuit or other appellate court, as in the settlement of other guardians and administrators.

III. The constitution commanded and the legislature established the probate court of Johnson county with jurisdiction over all probate matters in said county, and specifically "to appoint guardians and curators of * * * persons of unsound mind and *settling* the accounts of guardians and curators." It will be observed that the organic law provides "*ex vi termini*" for the establishment of *a court*, which shall have this special *jurisdiction*. The legislature did not neglect to comply with this mandate. It created the court and gave it all the jurisdiction the constitution authorized.

It is not to be questioned that the probate court had original jurisdiction, upon information, to cause the parties to be notified, to impanel a jury, hear the evidence and receive the verdict that Ashby was insane, and thereupon could appoint a guardian, pass upon the sufficiency of his bond and inventory, and annually, and oftener, if it saw fit, require him to render to it just and true accounts, and make settlement thereof with such court.

Nor is it doubted that, upon proper petition of the guardian, the court may make all proper orders for the restraint, support and safe-keeping of the insane person, and for the management of his estate, the support and maintenance of his family, and the education of his children out of the proceeds of his estate, and for these

purposes may make orders to set apart and reserve for the payment of debts and to let, sell or mortgage any part of the lunatic's estate, real or personal. In other words, no question is made of the power to take under its control the person and estate of the unfortunate person, appoint a guardian, sell and dispose of his estate in the payment of debts, or disburse it for the benefit of his family; but when death comes, and there is no longer occasion for a guardian, the court to whom that guardian owes his appointment, under whose eye he has administered his trust, loses all jurisdiction over him, and cannot make a final adjustment of his accounts. The reasons advanced for such a conclusion are that section 5825 does not provide for a final settlement, and does not call for any action whatever by the probate court. This proposition is *res nova* in this state. No case has been cited, nor have we been able to find any in which it has been adjudicated.

The statute of 1825, as already seen, provided in explicit terms for a final settlement, and gave ample power to the probate court to enforce its decree and orders. The contention now before us would have been of easy solution under that statute.

But it is urged as a reason why the probate courts do not possess that power now, that the provision as to final settlement in the statute of 1825 was omitted in the revision of 1835 and all subsequent statutes. This is to a certain extent true, but in all the revisions prior to 1879 the courts having probate jurisdiction "had full power to control the guardian of any such insane person in the management of the person and estate, and the settlement of his accounts, and to enforce and carry into execution their orders, sentences and judgments."

Language so comprehensive as this certainly ought not to be construed as applying merely to annual settlements. From the earliest period of our statehood, this court has never construed annual settlements as final judgments; hence, when the legislature through all these years in this connection spoke of these settlements as judgments, we think it fair to presume they referred to final settlements, to which this court has uniformly attributed the same effect as attaches to final judgments in other courts.

Nor do we think there is anything in the terms used or the context that would justify any court in restricting the word settlement in the act of 1835 and those following to annual settlements. Such has not been the construction of other grants of jurisdiction. So that, had that section 44, *supra*, been retained in the revision of 1879, we do not think there would be a reasonable doubt of the jurisdiction of the probate court to make final settlement in such cases.

And here lies the principal difficulty. When the legislature came to revise the statute in 1877, to bring it in harmony with the constitution, it found the statutes from 1835 to that date had granted this jurisdiction to the *county courts*. Revised Statutes, 1835, sec. 44, p. 327; Revised Statutes, 1845, sec. 44, p. 599; Revised Statutes, 1855, sec. 44, p. 870; General Statutes, 1865, sec. 44, p. 238.

As the constitution required the jurisdiction henceforth should be vested in the probate courts, this section was repealed.

It is argued that, inasmuch as the legislature repealed this section in its entirety and did not substitute the words "probate courts" for "county courts," it intended to deprive the newly established courts of the power that previously existed in the county courts.

It must be confessed that, if the legislature intended to continue in the probate courts the powers exercised by the county courts in this respect, the change in the title of the courts so empowered would have wrought the change in a most satisfactory way. But it is a familiar rule that statutes and constitution *in pari materia* must be construed together, and as the constitution had commanded the establishment of a court with jurisdiction over "the appointment of guardians and curators of insane persons and settling their accounts," and as the legislature had already enacted into the statute a provision coextensive with the constitution in this regard, is it not just, to attribute to that department of the government an intention to make its grant effective, and might it not very properly have considered it unnecessary to repeat what was amply expressed in the section conferring jurisdiction? It is true the language used in conferring jurisdiction is general, but, as already said, it is broad enough to include a final settlement. Clearly it points to the last settlement to be made, as upon its completion the guardian is required to turn over all the assets in his hands to the personal representatives. It is a final disposition of the trust in that court.

The jurisdiction over the persons and estates of insane persons was exercised by the lord chancellor in England, by virtue of the king's prerogative. In this country it has been confided in some states to the courts of equity, and in others to probate courts. In whatever court the power is vested, it has ever been the aim and purpose of the legislature to carefully guard the personal and financial interests of the unfortunate and his family.

The practice in the chancery courts has been followed in this country in the administration of trusts as far as practicable, and we can look there for the

origin of our present system. The chancery courts upon the death of the insane ward required the committee to finally settle his accounts in that court, before turning the estate over for distribution. What is meant by "settling accounts," as used in the statute? Does it mean, as asserted by the learned counsel for the appellant, the *rendering* of an account merely, of the filing of which no one is notified, and over which the court has no power, either to strike out unlawful credits or to compel the addition of proper debits? Is it to be only *prima facie* correct or conclusive, unless impeached in a court of equity for fraud?

It is important to answer these questions correctly. Judge WOERNER, whose experience and ability alike command respect upon matters pertaining to probate jurisdiction, in the second volume of his work on the "American Law of Administration," section 502, says: "It is apparent that the mere *rendering* of the account, even if approved by the court in an *ex parte* proceeding, can have no validity to bind a party interested; hence, a distinction is sometimes taken between the rendering of *an account* and its *settlement*, the former being the act of the executor or administrator, constituting the basis of the settlement, the latter the act of the court judicially determining—*settling*—the questions involved."

That the word owes its signification to the connection in which it is used, must be apparent. Thus in *Tittman v. Green*, 108 Mo. 22, upon the question whether a certain settlement had been admitted in evidence or rejected, division number 2 of this court used this language: "We have carefully read the full stenographic report of the offer, the objections, the colloquy between counsel, and the court and counsel, and we think the record entry was admitted, but the *settlement itself* was excluded. We would not be mis-

understood. In our view, the curator's itemized account, signed and sworn to, was *the settlement* alluded to, objected to and excluded by the court. *In contemplation* of law, that paper and accompanying vouchers *with* the *action* of the court *upon it,* as shown by the record, constitutes the settlement proper."

In *Roberts v. Spencer,* 112 Ind. 85, Judge NIBLACK for the whole court says: "The term 'final settlement' as applied to the administration of an estate, is usually understood to have reference to the order of the court approving the account which closes the business of the estate, and which finally discharges the executor or administrator from the duties of his trust, and ought generally to be so construed when there is nothing in the context justifying or requiring a different construction. *Parsons v. Nilford,* 67 Ind. 489." And yet in that case the court construed the statute as referring to the time when the account for final settlement was filed, rather than the date of its approval, so as to bar a claim "not filed at least thirty days before the final settlement."

In *Remington v. Walker,* 21 Hun, 322, the supreme court of New York held that "the rendering of an account to a surrogate * * * and the *settlement* of that account, after it has been rendered, are separate and distinct proceedings," citing *Westervelt v. Gregg,* 1 Barb. Ch. 469.

In *Hall v. Grovier,* 65 Mich. 428, the same distinction is drawn between rendering an account and settling it. The latter is the act of the court.

So that in determining the purpose of this provision in section 5825, Revised Statutes, 1879, the scope of the whole chapter should be considered, the fact that it is clearly the intention of the statute that the trust shall cease and the trust fund be turned over to the personal representatives; and, giving to the term "settle" the

usual signification, that it implies a permanent condition, a something finally established by mutual agreement, we think that it was intended to mean the guardian should make a final settlement, and that settlement should be made with that court from whom he received his appointment, under whose orders he administered the trust and to whom the constitution and the statutes had intrusted the estate of the insane. While his power as guardian ceases as to further management of the estate, and the probate court could not distribute the estate through him to the next of kin, still in the very nature of things it is eminently the function of that court to settle his accounts.

As was said by Lord Chancellor HART, *In re Barry*, 1 Molloy's Reports in Chancery, 414: "I can make the committee of the fortune *account; that is within my jurisdiction, from the necessity of the case.* I cannot dispose of rights, but it is incidental to the authority to call upon the committee to wind up his account, and to hold the assets in safety." The trust ceases, but the obligation to finally account for the trust estate does not cease until the guardian has accounted to the court, whose officer he is.

This construction of this section must be to the advantage of all concerned. The guardian upon notice to the personal representative can finally adjust his accounts in the court where the trust began, receive his discharge and exonerate his sureties. On the other hand, the personal representative being notified can appear, and without delay see that the accounts are properly rendered and receive the estate, and will not be forced to accept an *ex parte* statement or bring a suit on the bond with a *prima facie* case against him. In the probate court the burden will be upon the guardian where it justly belongs till he has made a final accounting in a court of competent jurisdiction.

IV.  And this brings us to the next objection, namely, that the statute evidently intended that the settlement should not be final because no notice of it was provided in the statute to interested parties.   The answer to this may be found in many adjudications of this court, and it is a familiar principle of the law that, where one's rights are to be affected, the law will imply a reasonable notice, and in this state "all courts shall have power to issue all writs which may be necessary in the exercise of their respective jurisdictions according to the principles and usages of law."

Accordingly this court in *Wickham v. Page*, 49 Mo. 526, said: "There is no express provision requiring notice when an attempt is made to proceed under section 67, and, therefore, it is argued that the court can obtain no jurisdiction against a surety under that section, as a judgment cannot be rendered against a person unless he is notified to appear, and the conclusion is deduced that the only remedy is by an action on his bond.   It is true that notice is not demanded in clear and explicit terms, but the law will imply that notice must be given before a party can be proceeded against."   See also *Brown v. Weatherby*, 71 Mo. 152; *State to use v. Jones*, 89 Mo. 478.

In *Chase v. Hathaway*, 14 Mass. 222, PARKER, C. J., said:  "There being no provision in the statute for notice to the party who is alleged to be incompetent by reason of insanity to manage his estate, it seems that the judge of probate did not think such notice essential to his proceedings.   But we are of opinion that, notwithstanding the *silence* of *the statute*, no decree of the probate court so materially affecting the rights of property and the person can be valid, unless the party to be affected has had an opportunity to be heard in defense of his rights.  *  *  *  It is to be understood as required that the tribunal, to which is

committed the duty of inquiring and determining, shall give opportunity to be heard." So that we think the jurisdiction having been clearly given, the notice can be supplied by the court itself. *Yeoman v. Younger*, 83 Mo. 424.

In this case, however, the question is speculative. Here the appellant went into court and filed his settlement, submitted to its judgment his accounts "as his first, *only and final settlements*," and, when that court would not approve the account rendered, appealed to the circuit court. Then the administrator voluntarily appeared to the proceeding, so that both the parties interested were before the circuit court.

V. The remaining objection to considering this a final settlement is that no appeal is provided by the statute from the settlement of the guardian with the probate court.

Even if no appeal were allowed, we do not think this would affect the jurisdiction of the probate court. Appeals are allowed by statute, but we know of no authority for denying the jurisdiction of any court, simply because no appeal was allowed from its judgments.

But there is a spirit pervading our statutes to allow appeals from all final judgments of courts, whether of limited or general jurisdiction.

As before said our present uniform system of probate courts was provided for in the constitution of 1875, and the statute of 1877, which was enacted to carry out the constitution. Section 1102, Revised Statutes, 1879, provides that "the circuit courts * * * shall have appellate jurisdiction from the judgments and orders of county courts, probate courts, and justices of the peace, in all cases not expressly prohibited by law, and shall possess a superintending control over them."

If we are correct in holding that the statute contemplated a final judgment and settlement of the guardian's accounts, it seems clear that an appeal lies to the circuit court, under section 1102, *supra.* Section 302, Revised Statutes, 1879, provides that "all probate courts and the clerks thereof shall be governed in all things by the provisions of this chapter as far as they may be applicable to their jurisdiction and duties." Applying the provisions of this chapter, a certain and definite mode of appeal is provided, with the consequence that, upon such appeal, the circuit court becomes possessed of the cause, and can hear it "*de novo.*"

This construction effectuates the intention of the constitution to vest the control of guardians of the insane in the probate court. It permits an appeal that is most clearly intended by section 1102, Revised Statutes, 1879.

By allowing this appeal in the manner and upon the terms specified in other probate cases, we have been scrupulous to avoid the charge of judicial legislation, and at the same time have endeavored to relieve our laws of the reproach of inconsistency in the administration of estates in probate courts. It follows that we hold that the guardian had a right to appeal to the circuit court, and upon his appeal that court became possessed of the cause as in other probate proceedings, and was authorized to hear and determine said settlement *de novo.*

VI. The appellant Coleman complains that the circuit court refused to allow him credit, in adjusting his accounts, for the sums he paid out on debts incurred by Ashby after the inquiry of lunacy and after he was found insane.

Prior to the appointment of Coleman, Hess, the father-in-law of Ashby, had been appointed his

guardian.    This was on the twenty-seventh of August, 1880.    Hess never gave bond or assumed control until July 21, 1884.    On the fifth of August, 1884, Ashby killed Hess.

Between the adjudication of Ashby's insanity and the giving of bond by Hess as his guardian, Ashby managed his own affairs.    He sold some of his land to one Inskeep, and held his notes secured by mortgage. These he placed as collateral with the bank of Holden, for moneys borrowed of it.    When Coleman was appointed the bank still held this Inskeep note as collateral for Ashby's notes, amounting to $1,913.30, including interest.

All these notes have been executed after the adjudication of lunacy.    Mr. Tevis, the cashier of the Holden Bank, testified that in 1882 "Hess, the first guardian, came into the bank *alone* one day, and told us we could go ahead and transact business with Ashby until he gave us further notice.    There had been some question between Mr. Cope, the president of the bank, and myself as to whether it would be best to transact business with Ashby.    We heard that he had been adjudged insane and Hess appointed guardian, but that Hess had not assumed charge of his affairs." Coleman inventoried the collateral notes.    French paid them under an arrangement with Coleman and the bank placed the amount to Coleman's credit, and he charged himself in this settlement with the proceeds.

Appellant complains that the court erred in refusing his seventh, eighth and tenth instructions, which were framed upon the theory that Ashby could continue to transact his business, after he had been adjudged insane, with the consent of his guardian.

All questions as to knowledge of his insanity and the adjudication are eliminated by the testimony of Mr. Tevis, the cashier, as to the bank debts, and the

only other note, excluded as a voucher, was the note to Wm. Neauman, for $1,066, executed March 27, 1884, and on this note Coleman, the guardian, was surety, and it was upon his information Ashby was adjudged insane.

The guardian insists that as Hess, his predecessor, had given Ashby, his ward, *carte blanche* to trade and dispose of his estate, that Ashby's contracts were binding and valid.   If such a construction as this is to be given section 5816, Revised Statutes, 1879 (sec. 5542, Revised Statutes, 1889), it will afford but scant protection to those for whose benefit it was enacted. It was the purpose and design of this statute to preserve the property and estates of those who were incapable of taking care of themselves or their property.   As was said by the supreme court of Pennsylvania: "It is not necessary to adduce reasons to prove the self-evident proposition that, to admit the capacity of control to exist in the lunatic   *   *   *   over his  estate after inquisition,  settling his condition in  this respect or submit it to be controverted by evidence of lucid intervals   *   *   *   at the moment of contracting, would leave the estates of this unfortunate class about as much exposed as before proceedings had in regard to them.   The inquisition and decree, standing of record, was intended for notice to all the world of the incapacity of the particular party to contract. . It is the judgment of the law to this effect, and, as a consequence, his acts in regard to his property are absolutely void while the condition exists."   *Imhoff v. Witmer's Adm'r*, 31 Pa. St. 243.

In *Rannells v. Gerner*, 80 Mo. 474, this court held the deed of an insane person after inquisition absolutely void, and, while some discussion of this section was held in that case, it was not determined what the signification of the words "without the consent of his

guardian" was. We have have no hesitancy now in saying that it does not authorize a guardian to permit his ward to transact his business as if sane, nor will it permit those who have notice of the adjudication to obtain the consent of the guardian to trade with the ward without limitation, as was done in this case. In *Reando v. Misplay*, 90 Mo. 251, this court held that the express contracts of an insane person were void. Any other conclusion would nullify the wise and humane provisions of the law.

Parties dealing with one whom they know the law has pronounced incapable of contracting have no right to complain. In this case the guardian knew his ward was insane, procured the adjudication, and knowing this it was his duty to demand his estate wherever he found it, and cannot complain if the court refused to allow him credits for demands paid by him, for which his ward was not liable. It may be a hardship in one sense, but a different rule would work great wrong, and cannot be tolerated. Those who assume these delicate duties should inform themselves of their obligations before the estates of their wards are dissipated, and not afterwards.

But we think the court was correct in so ruling for another reason. Hess had never given bond and had never assumed to act as guardian at the time of his conversation with Tevis, and Tevis knew it. So that the consent of Hess added nothing to the contracts of Ashby. *Stagg v. Green*, 47 Mo. 500.

There was no error in the other declarations of law, and there is nothing in the finding of facts that calls for any review in this court.

The judgment should be and is affirmed.

BLACK, BARCLAY and THOMAS, JJ., concur in all that is said.

All agree as to paragraph 1.

BRACE, MACFARLANE, JJ., and SHERWOOD, C. J., dissent as to paragraphs 2 and 3, and BRACE, J., does not concur in paragraph 4.

BRACE, J. *(dissenting)*.—The reasons for my dissent to the opinion of the majority of the court in this case appear in the original opinion, handed down by me in division number 1, as follows:

"On the twenty-seventh of August, 1880, in vacation of the probate court of Johnson county, an information in writing was filed in said court, that one James L. Ashby was of unsound mind and incapable of managing his affairs. On the same day, without notice to said Ashby and without bringing him before the court, an inquiry was had before a jury who found that the said Ashby was "of unsound mind and a fit subject for the lunatic asylum;" thereupon, the court appointed W. F. Hess "guardian of the person and estate of said Ashby," and required him to give bond as such in the sum of $10,000.

It appears from the evidence that Ashby was a merchant, farmer and trader, and doing a pretty extensive business for his locality. After the inquiry he was taken to the asylum, where he remained but a short time; upon being discharged he returned home and resumed control of his business and continued managing his affairs until the twenty-first of July, 1884. Hess was Ashby's father-in-law and resided with Ashby; he never qualified or exercised any control over Ashby's business until the latter date, when he gave bond, and afterwards on the fifth of August, 1884, was killed by Ashby. Afterwards on the eleventh of August, 1884, the appellant Coleman was appointed by the probate court guardian and curator of Ashby, gave bond and took charge of his estate; had the same inventoried and appraised, and proceeded in the

discharge of the duties of a guardian and curator of an insane person as to such estate.

Afterwards Ashby died, and respondent Farrar was appointed administrator of his estate, and afterwards, on the twenty-third of August, 1886, the said Coleman filed in said court a statement of his account as guardian and curator of the estate of said Ashby, showing that the total amount of the assets of said estate that came into his hands was the sum of $10,535; that of such assets he had then in his hands uncollected notes and accounts amounting to the sum of $5,052.74; that he had realized in cash from such assets the sum of $5,460.53, and that he had disbursed on account of said estate as per voucher filed therewith the sum of $6,489.55. Upon examination of said statement, the probate court found the statement correct as to the amount of the uncollected notes and accounts and gave him credit therefor; but found him entitled to credit for disbursements only to the amount of $2,501.82, leaving a cash balance due from him to the estate of $2,980.45, which amount the court ordered him "to pay over to the administrator of the estate of the said James Ashby, deceased, and to take his receipt for same, and that he turn over to said administrator the uncollected assets."

From this order Coleman appealed to the circuit court, in which court Farrar, the administrator, appeared for the first time, so far as this record shows, and moved that the judgment of the probate court be affirmed upon the record; which motion being overruled, the case was tried *de novo*, and the account restated by the circuit court; the court finding the amount of total assets and uncollected notes and accounts to be correct as stated in the original account; that the amount of cash received by the guardian was $5,482.26; that the amount of credits to

which he was entitled for disbursements was $2,845.46, leaving a balance due the estate of $2,636.80, and thereupon ordered said guardian to turn over to said Farrar, administrator, the uncollected notes and accounts and rendered judgment in favor of the administrator against said guardian for said sum of $2,636.80, with six per cent. interest from the twenty-third day of August, 1886.

From this judgment the guardian appeals to this court.

Of the disbursements for which the guardian claimed credit the probate court disallowed the sum of $3,987.73, and the circuit court disallowed the sum of $3,644.09. The particular items disallowed by the circuit court are set out in the account stated by said court and consist of five vouchers disallowed in whole, amounting to the sum of $2,290.32, and five vouchers disallowed in part to the amount of $953.77, and $400 of the credit of $1,000, allowed by the probate court for services as guardian.

The main controversy is upon the disallowance of the credits claimed as per the ten vouchers, which were obligations contracted by Ashby after the inquiry of lunacy aforesaid, and before Coleman qualified as guardian, and which were paid by him before the death of said Ashby.

It appears from the instructions given and refused that the circuit court in adjusting the account proceeded upon the theory that the debts incurred by Ashby, after the inquiry of lunacy, and paid by the guardian Coleman, except so far as they were incurred for necessaries for the support of Ashby and his family, were absolutely void, and that the guardian by paying them acquired no right to a credit for such payment in his account.

I. By the constitution and laws of this state, jurisdiction over matters pertaining to the appointment of guardians and curators of insane persons and settling the accounts of such guardians and curators is vested in the probate court. Constitution, art. 6, sec. 34, Revised Statutes, 1879, sec. 1176.

The appellant, having accepted the appointment of the probate court to the office of guardian of James L. Ashby as an insane person, qualified as such under that appointment, received his estate and brought his account into said court for settlement, on appeal from the action of said court thereon to the circuit court, cannot in the latter court or here question the validity of his appointment or deny the jurisdiction of the probate court over his settlement. *Rollins v. State to use*, 13 Mo. 437; *Mississippi Co. v. Jackson*, 51 Mo. 23; 18 Mo. App. 26; *Potter v. Adams' Ex'rs*, 24 Mo. 159; *Fox v. Minor*, 32 Cal. 111; *People v. Norton*, 9 N. Y. 179; *McClure v. Com.*, 80 Penn. St. 169; 2 Herman on Estoppel, p. 1040.

II. The duties of such guardian and curator are prescribed, and the exercise of jurisdiction by the probate court over his settlements is governed by chapter 116, Revised Statutes, 1879, sections 5815, 5824 and 5825, which are as follows:

"Sec. 5815. Every guardian of an insane person shall, once a year, or oftener, if required by the court appointing him, render to such court a just and true account of his guardianship and make settlement thereof with such court."

"Sec. 5824. If it be found that such person has been restored to his right mind, he shall be discharged from care and custody, and the guardian shall immediately settle his accounts, and restore to such person all things remaining in his hands belonging or appertaining to him.

Coleman v. Farrar.

"Sec. 5825. In case of death of such insane person while under guardianship, the power of the guardian shall cease, and the estate shall descend and be distributed in the same manner as if such person had been of sound mind and the guardian shall immediately settle his accounts, and deliver the estate and effects of his ward to his personal representatives."

The law governing the settlements of guardians of insane persons as contained in these sections which are the only ones on the subject has remained unchanged since 1835. Revised Statutes, 1835, secs. 31, 40, 41, pp. 325, 327; Revised Statutes, 1845, secs. 31, 40, 41, pp. 597, 598; Revised Statutes, 1855, ch. 81, secs. 31, 40, 41; General Statutes, 1865, ch. 40, secs. 31, 40, 41. Previous to 1835, jurisdiction over the estate of insane persons was vested in probate courts (Laws 1825, sec. 5, p. 269), and such courts were invested with power in case of death of an insane person under guardianship to make final settlement with his guardian (sec. 13, p. 434) to order him to render the estate to such person as the court shall direct and to enforce and carry into effect its orders, decrees and sentences in the same manner as courts of chancery may do (by attachment, imprisonment for contempt, or by sequestration for disobedience of such orders by the guardian, sec. 15, p. 435).

The act of 1835 (the present law upon that subject, Revised Statutes, 1889, ch. 86, secs. 5541, 5550, 5551) does not confer such power upon the probate court; no provision is made for a final settlement of the estate by the guardian with such court, and no power given to enforce its orders in regard to settlements, made by the guardian with such court, and no appeal provided for from such orders. In all these respects the provisions of this act are radically different from

VOL. 112—6

those governing settlements of guardians of minors and executors and administrators, in which provision is made for notice to parties interested, a final and conclusive settlement with a right of appeal to the circuit court and a trial therein *de novo*. Revised Statutes, 1879, secs. 238, 239, 292, 299, 2610, 2616.

No distinction is made in the act between the settlement to be made by the guardian annually, when the ward is restored to his right mind, or when he dies, as to the power of the probate court over them, or their force and effect when made—they are all *ex parte* proceedings without notice, and mere statements of the guardian, accounts to be adjusted by the court so as to show the then condition of the estate in his hands; the idea of their being conclusive or final, either for or against the guardian, is not only not expressed in the statute, but is excluded by the consideration that no appeal and trial *de novo* is provided for, by means whereof such settlements might be re-examined in a higher court.

In *State to use v. Jones*, 89 Mo. 470, we held that the annual settlements of a guardian, of an insane person with the probate court have not the effect of a final judgment, and are only *prima facie* evidence of their correctness; and, as the law makes no distinction between the force and effect of such settlements and those made by the guardian where the ward is restored to his right mind or dies, we must now hold that the settlement of such guardian, upon the death of his ward, with the probate court can have no other or different effect. To hold otherwise would be a dangerous species of judicial legislation, since these settlements may be made without notice to the restored ward or his personal representative if he be dead; and the law has provided no way of having them re-examined and corrected by appeal to a superior tribunal in

case of error or overcharges.  For if it could be held that they were final and conclusive, and that an appeal would lie under the comprehensive language of section 1102, Revised Statutes, 1879, giving appellate jurisdiction to circuit courts from the judgments and orders of probate courts in all cases, not expressly prohibited by law, yet, no provision having been made for a trial *de novo* upon such appeal, its only effect would be to bring the record before the court as in case of *certiorari*, and the merits of the settlement could not be inquired into.  *Lacey v. Williams*, 27 Mo. 280; *Lewis v. Nuckolls*, 26 Mo. 278; *St. Louis Co. v. Lind*, 42 Mo. 348.

When the account has been stated by the probate court and made a matter of record, the court has exhausted all the power vested in it by the law, which nowhere authorizes it to render a judgment thereon. Where the guardian has thus settled his accounts, the law then imposes upon *him* the duty of delivering the estate and effects of his ward to his personal representative under the penalty of his bond.  While the settlement he makes with the probate court is the last settlement he makes with the court, it is not the last nor the final settlement he must make of the estate of his ward; that final settlement he must make with the ward himself if he is restored to his right mind, or with his personal representative if he dies.  And in an action upon the bond by such ward or his personal representative, should the guardian fail to discharge his duty in accounting for and delivering over to such ward or his personal representative the estate in his hands, these settlements in the probate court can be no more than *prima facie* evidence of the condition of the account of the guardian at the time they were made.

It follows, if my construction of this statute be correct, that no appeal would lie in this case, and the

probate and circuit courts had no power to render final judgment therein against the appellant," on his account.

MACFARLANE, J. *(dissenting)*.—The foregoing opinion by BRACE, J., I think conclusively shows that the legislature did not provide, and did not intend to provide, that the settlement made with the probate court by a guardian of an insane person after the death of his ward should be final and conclusive.

It is now insisted, however, on reargument before the court *in banc*, that the jurisdiction conferred upon probate courts by section 34, article 6, of the constitution of the state, over all matters pertaining to the appointment of guardians and curators of minors and persons of unsound mind, and of settling the accounts of curators and guardians, authorized such courts, without legislative action, to make final settlements with such guardian after the death of his ward, and to enter thereon a judgment which should be final, and from which an appeal to the circuit court would lie.

Such has not been the judicial construction given to similar constitutional grants of jurisdiction.

The construction given such grants is well expressed by the supreme court of Mississippi in case of *Supervisors v. Arrighi*, 54 Miss. 672 as follows: "Jurisdiction over roads, ferries and bridges is by the constitution conferred upon the boards of supervisors, just as equity jurisdiction is conferred upon the courts of chancery and appellate jurisdiction upon this court. It is not within the power of the legislature to take away these several jurisdictions or bestow them upon other tribunals; but, by virtue of its possession of the general legislative authority of the state, it may prescribe the mode and manner in which these several jurisdictions shall be exercised; and the regulations prescribed will

be obligatory, unless they amount practically to a deprivation of power.''

The constitution of this state (1865) gave county courts jurisdiction to transact all county business. In considering the validity of a business transaction of the county, done by the county court, this court held that the statute constituted the warrant of attorney prescribing the authority of these county courts, and, whenever they step outside this statutory authority, their acts were void. *Sturgeon v. Hampton*, 88 Mo. 213; *Saline Co. v. Wilson*, 61 Mo. 237.

To the same effect have been the rulings of this court in construing the orders of probate courts made beyond the authority given them by the statute. *Pres. Church v. McElhinney*, 61 Mo. 541; *Coil v. Pitman's Adm'r*, 46 Mo. 57; *State to use v. Jones*, 89 Mo. 478.

It will be seen that, while the constitution defines the general subjects over which these inferior courts shall have jurisdiction, it leaves the legislature to determine and prescribe the mode and manner in which their jurisdiction shall be exercised. The legislature (sec. 3397) merely declared the general jurisdiction of probate courts in respect to guardianship of persons of unsound mind in the language of the constitution, and did not see fit to require them to make final and conclusive settlements in the court upon the death of their wards, from which an appeal could be taken, and this court has no right to assume the functions of that department of government.