ON MOTION FOR REHEARING.
Learned counsel for appellant has filed a quite vigorous motion for rehearing. Some things in it deserve attention. Our present opinion was a recast of a dissenting opinion, which was written before the divisional opinion was up for considerationRejected in Court in Banc. This divisional opinion turned uponOpinions. the jurisdiction of this court, and was rightfully rejected. Counsel complains that this opinion in division, and the opinion of the St. Louis Court of Appeals were not considered by this court in the opinion filed. The divisional opinion was most certainly considered by the court, because it was rejected, and was thereafter no opinion, and required no further consideration in the present opinion. The same is true as to the opinion of Judge NIPPER (the Commissioner of the Court of Appeals), for after his opinion the Court of Appeals granted a rehearing, and that opinion, as the expression of a court, fell into the discard. After rehearing was granted the case then stood in the Court of Appeals as if there had been no hearing or disposition. Although printed in appellant's briefs here, it is not an opinion for our consideration. It might be adopted by appellant as an argument, and so considered here as a part of appellant's *Page 117 
argument. It was no opinion, and as such required no mention. But as said, our opinion was only a dissenting opinion, later changed slightly for the opinion of the court. In the dissent we had gone over the record carefully, and reached the conclusion that there was no substance in the appellant's contentions and so affirmed the judgment. We have read and reread the record and all briefs. The question of our jurisdiction was the main question stressed here, but we shall notice others, now reiterated in the motion for new trial, in the paragraphs to follow. This we do, notwithstanding learned counsel for respondent challenges the motion for rehearing, and says it does not comply with our rule.
I. It is urged that our opinion simply says that the issues were covered by proper declarations of law, without even discussing or setting out the same. We had the right to so dispose of them, because the defendant (so far as the record before us shows) neither objected to the giving ofInstructions. these instructions, nor excepted to the action of the court in giving them. And this, in a trial of issues purely at law and not in equity. [State ex rel. v. Bird,253 Mo. 569.] In other words, he acquiesced in these declarations of law. He cannot now complain. We gave to the instructions all the notice we should have given in our opinion. If appellant was satisfied with them, we had a right to assume that they were proper. At any rate, absent an objection and an exception, they require no further notice, and cannot now be urged as error. Appellant even failed to except to instruction numbered 3, where the court declared that if McMenamy was not previously cited to show cause why he had not filed an inventory, and thus given a day in court, he could not be summarily removed without violating the constitutional provisions named in such instruction. In other words, he had not been given due process of law. To this instruction, as is true of them all, the appellant neither objected nor excepted. It might be properly said that he (by this *Page 118 
failure) acquiesced in the view of the trial court as to a constitutional question. This much for some of the under brush in the motion for rehearing. This court can only take a record as we find it. We can neither add to nor take therefrom. If hardships follow, the court is not responsible.
II. It is contended that the circuit court had no jurisdiction. We find no place in the record where the point is expressly raised until after the conclusion of the three days' trial, when a motion was filed suggesting the matter of jurisdiction. The court overruled it, and in the ruling the courtAppeal to suggested that he had previously ruled upon thatCircuit question. The record shows no attack upon theCourt. jurisdiction in the pleading, nor by motion other than we have stated, supra. This, however, is not very material, because the claim is that no appeal will lie from the probate court to the circuit court in this kind of case, and this is jurisdiction as to subject-matter, and can even be raised in this court for the first time. If there is a right of appeal, then the question of jurisdiction is settled. We had been over appeals from a probate court to the circuit court in Leahy v. Mercantile Trust Co., 296 Mo. 561, and hence we said nothing on this question in the opinion. The motion for rehearing would indicate that learned counsel want all questions discussed, whether previously settled or not. We shall therefore point to the statute and some cases. The claim is that under the law as to the insane, there is no appeal mentioned, and hence the appeal in this case conferred no jurisdiction of the subject-matter upon the circuit court. The right to appeal has been expressly ruled upon by this court, in a case where a guardian of an insane person was removed by the probate court. [Hall v. County Court of Audrain County, 27 Mo. 329.] At that time probate matters were vested in the county court, which jurisdiction was afterward transferred to the probate court. The ruling in the case, supra, was not based upon any provision in the *Page 119 
statutes as to insane persons, but upon Section 8 of chapter 47, Revised Statutes 1855, which, so far as applicable, reads:
"Fourth, Appellate jurisdiction from the judgments and orders of county courts and justices of the peace, in all cases not expressly prohibited by law, and shall possess a superintending control over them; (c) Fifth, A general control over executors, administrators, guardians, curators, minors, idiots, lunatics, and persons of unsound mind."
This section has been broadened as the jurisprudence of the State changed, so that the law now is, as expressed in the 4th sub-head of Section 2436, Revised Statutes 1919, which reads:
"Fourth — Appellate jurisdiction from the judgments and orders of county courts, probate courts and justices of the peace, in allcases not expressly prohibited by law, and shall possess a superintending control over them, and a general control over executors, administrators, guardians, curators, minors, idiots, lunatics and persons of unsound mind."
The words "expressly prohibited by law" are common both to the law of 1855 and the present law. When it is considered that the jurisdiction of the county courts was later transferred to probate courts, so far as insane persons, and others, were concerned, the application of this old case becomes apparent. In the Hall case, where a guardian of an insane person had been removed by the county court, this court compelled the county court to grant an appeal.
According to the contentions of learned counsel there could not be an appeal from any final judgment or order made by the probate court in the course of administering the estate of an insane person. They urge that Article XVIII of Chapter I, Revised Statutes 1919 (which pertains to guardians and curators of insane persons), is a law unto itself, and as said article makes no provision for an appeal, there can be no appeal allowed. If this be true no final judgment or order made *Page 120 
by the probate court in the administration of an insane person's estate can be reviewed upon appeal in the circuit court. This court has never so ruled. Following the Hall case, supra, we have the exhaustive opinion of GANTT, J., in Coleman v. Farrar, 112 Mo. l.c. 72, to the same effect. Judge GANTT says:
"But there is a spirit pervading our statutes to allow appeals from all final judgments of courts, whether of limited or general jurisdiction.
"As before said our present uniform system of probate courts was provided for in the Constitution of 1875, and the Statute of 1877, which was enacted to carry out the Constitution. Section 1102, Revised Statutes 1879, provides that `the circuit courts . . . shall have appellate jurisdiction from the judgments and orders of county courts, probate courts, and justices of the peace, in all cases not expressly prohibited by law, and shall possess a superintending control over them.'
"If we are correct in holding that the statute contemplated a final judgment and settlement of the guardian's accounts, it seems clear that an appeal lies to the circuit court, under Section 1102, supra. Section 302, Revised Statutes 1879, provides that `all probate courts and the clerks thereof' shall be governed in all things by the provisions of this chapter as far as they may be applicable to their jurisdiction and duties.' Applying the provisions of this chapter, a certain and definite mode of appeal is provided, with the consequence that, upon such appeal, the circuit court becomes possessed of the cause, and can hear it `de novo.'
"This construction effectuates the intention of the Constitution to vest the control of guardians of the insane in the probate court. It permits an appeal that is most clearly intended by Section 1102, Revised Statutes 1879.
"By allowing this appeal in the manner and upon the terms specified in other probate cases, we have been scrupulous to avoid the charge of judicial legislation, and at the same time have endeavored to relieve our laws *Page 121 
of the reproach of inconsistency in the administration of estates in probate courts. It follows that we hold that the guardian had a right to appeal to the circuit court, and upon his appeal that court became possessed of the cause as in other probate proceedings, and was authorized to hear and determine said settlement de novo."
Coleman was the guardian of an insane person, and made a settlement of the estate, but the probate court disallowed some matters, and Coleman appealed. It was urged there, as it ishere, that there was no statute for such an appeal. Judge GANTT went to Section 1102, Revised Statutes 1879 (the Circuit Court Act), and under its authority sustained Coleman's right to an appeal. McMenamy is appealing from a final order or judgment ousting him from the position of co-guardian, and under Revised Statutes 1919, Section 2436, which is the same as Section 1102, Revised Statutes 1879, is entitled to his appeal, and the jurisdiction of the circuit court cannot be questioned or denied.
In Stanton v. Johnson's Estate, 177 Mo. App. l.c. 56, ELLISON, P.J., upon the question at issue here, says:
"It is insisted that an appeal from the probate court is not allowed by law in cases affecting the administration of an estate of an insane person, under Sections 474-533, Article 19, Revised Statutes 1909. It is said that the statute is complete within itself and that no appeal is provided for and hence none should be allowed. But defendant has overlooked the fourth clause of Section 3956, relating to the jurisdiction of circuit courts, reading as follows:
"`Appellate jurisdiction from the judgments and orders of county courts, probate courts and justices of the peace, in all cases not expressly prohibited by law, and shall possess a superintending control over them, and a general control over executors, administrators, guardians, curators, minors, idiots, lunatics, and persons of unsound mind.' The question was determined in Coleman v. Farrar, 112 Mo. 54, 72." *Page 122 
Section 3956. Revised Statutes 1909, is Section 2436, Revised Statutes 1919. In Brockman v. Webb, 189 Mo. App. l.c. 476, the same distinguished judge said:
"We think it was error to dismiss the appeal. Defendant says that the only right of appeal from the probate court to the circuit court is found in Section 289, Revised Statutes 1909, and that that section does not authorize an appeal from the judgment of a probate court setting aside a judgment rendered by that court. Passing by this position without decision, we find that that section is not the only statute on appeals from the probate court. Under the title `Circuit Courts,' Section 3956, fourth subdivision of the statute, an appeal lies from the judgments and orders of the probate court to the circuit court `in all cases not expressly prohibited by law.' In this case the probate court had rendered a judgment of allowance of a demand against an estate. Afterwards the administrator filed a motion to set aside and annul such judgment and it was so ordered by the probate court. We think it clear that an appeal lies to the circuit court in such instance. [Coleman v. Farrar, 112 Mo. 54, 72; Stanton v. Johnson's Est., 177 Mo. App. 54.]"
Since the opinion of GANTT, J., in Coleman's case, supra, the right to have an appeal (unless it is expressly prohibited by law) from any final judgment or order made by a probate court has never been denied by this court, but on the other hand fully sustained under Section 2436, Revised Statutes 1919. [Leahy v. Mercantile Trust Co., 296 Mo. l.c. 600-601.] It matters not whether such final judgment or order is in the estate of an insane person, or in some other branch of probate jurisdiction. The contention of learned counsel for appellant in this case, if sustained, would absolutely prohibit an appeal of any kind in matters pertaining to the estate of an insane person, and those connected with such estate. No such thing was ever contemplated. In the instant case there was a right to an appeal and the appeal granted vested the circuit court with jurisdiction to hear the matter anew, as the cases read. *Page 123 
III. John McMenamy was called as a witness. The printed abstract and record before us shows no objection to the testimony of McMenamy when he was first put upon the stand. McMenamy was a competent witness for many purposes, and could notWitness: have been excluded altogether. [Elsea v. Smith, 273Competency. Mo. l.c. 408 and cases cited.] He may not have been competent to testify as to the gift. McMenamy testified at length, without a word about the gift. Then the following occurred:
"THE COURT: At the adjournment last evening we had the question before us as to whether or not the testimony of Mr. McMenamy was competent at this time. The court took that question under advisement, and after an examination of the law, and particularly this case of Imboden v. Trust Company, 111 Mo. App. 232, that while the proceeding in which Mr. McMenamy was called as a witness was not a proceeding between exactly the same parties that are parties of record here, yet it was a part of the same proceeding, to-wit, the examination of this witness in the estate of this non compos. The same parties in interest that were there and represented there are here and represented here. You have received the benefit of that testimony by placing him on the witness stand and, therefore, it is the conclusion of this court that you have waived any objection to the competency of Mr. McMenamy to testify to that transaction between her and himself here, and so, for that reason, the objection will be overruled.
"MR. LEAHY: May it please your Honor, the court, I think, is laboring under a misapprehension as to what took place in the probate court. At the time this hearing took place in the probate court I was retained simply to appear for the daughter of John McMenamy, to see if a guardian was to be appointed, that, at least, some rep-representative who wasn't adverse to be her guardian. At the hearing at that time none of us knew that Mr. McMenamy claimed a gift. The question there arose that Mr. McMenamy had taken title to this property on Lindell *Page 124 
Boulevard, and we were under the impression that that property had been paid for by the moneys of Angela McMenamy. Mr. McMenamy was questioned by Judge Holtcamp as to where he got the money that he put in that property, and in whom the title to the property was, and he was unable to answer; and it was not until some time afterwards, at the hearing in the probate court, I stated to the court that I had known Mr. McMenamy for many years; that his reputation and character were excellent, and I considered him a perfectly honest man, but that there was a contention between these parties as to who owned that property on Lindell Boulevard, and, therefore, there being such a contention, I thought that both parties should be represented by guardians. The court took that matter under advisement, this was purely an informal hearing, and finally appointed two guardians. Mr. McMenamy objected to anyone than himself being guardian for his wife. I stated if he would make an accounting that was satisfactory I would see to it that Doctor Kane would immediately resign as co-guardian and allow him to have exclusive guardianship. Thereupon Judge Marshall appeared in my office and gave me a statement, in which statement I, for the first time, learned that Mr. McMenamy claimed that his wife had made him a Christmas present of $24,000. We had the books examined of Mr. McMenamy —
"THE COURT (interrupting): He made that statement down there, did he?
"MR. LEAHY: What statement?
"THE COURT: He made that statement in the probate court, that his wife had made him a present of that amount?
"MR. LEAHY: No; not until long afterwards. I have the papers here. Now, as far as the final results of this hearing are concerned, I don't think it is very material, but I do think your Honor is committing an error, and I simply save my exceptions to your Honor's ruling."
Note there is not a word said to the effect that McMenamy was incompetent to testify to a gift from his *Page 125 
wife because of her insanity. The record then shows that McMenamy was recalled, and after he had testified to other matters, and stated that he was at the house upon the Christmas day when General O'Meara and his sister and the mother Mrs. O'Meara were there, the witness then said:
"Witness was then asked what took place on that occasion. He answered: `It was a great event to have Mrs. O'Meara to call at our home, and more especially at the wind-up of the building of a new house; and, therefore, we arranged to have a pleasant time, and they had it. And Mr. O'Meara and his mother and sister came at noontime. We had dinner, looking over the tree, and enjoyed the afternoon until about three o'clock, when my wife had a present for the children."
It was at this point that counsel said:
"MR. LEAHY: One moment. We wish to renew our objection to this testimony. It is not competent. This witness is mistaken when he testifies that he appeared at the hearing and testified at the hearing at which I was present; he was never sworn.
"THE COURT: He says that he was, and Judge Marshall says he was.
"MR. LEAHY: Here are the records of the case. I never heard of this case until after there had been a hearing.
"THE COURT: There were no stenographic notes taken of that proceeding in the probate court, so what kind of a record could you offer this for?
"MR. LEAHY: I would like to interrogate this witness.
"THE COURT: On the voir dire?
"MR. LEAHY: Yes.
"THE COURT: Go ahead.
 "Voir Dire Examination.
"On the voir dire examination, the witness was asked that if the hearing referred to at which Mr. Leahy was present was not after the hearing had been had as to the sanity of his wife. Witness testified that he did not know; *Page 126 
that he came to the probate court at that time and found the persons named present; that there was no jury. He was then asked the following questions:
"Q. And the question that was before the court then was the question of whom the court would appoint as guardian for your wife? A. Yes, I guess that."
The witness was then asked the date of this, and witness answered that he had the summons at his office; that he hadn't the date with him of the notice sent by the court to appear in court at a certain time; that he was sure there was no jury there; that he took the stand and was examined by Mr. Leahy.
"MR. LEAHY: He seems to be quite positive, your Honor, but even so, that was simply the question, to determine whom the court would appoint guardian.
"THE COURT: Wasn't that all a part of this sanity proceeding?
"MR. LEAHY: No.
"THE COURT: Isn't an appointment of a guardian a part of the proceeding, and aren't the parties there the same parties in interest? You received the benefit of his testimony there and you have locked the gate against yourselves here."
No objection had been made before this one which was to the effect that witness was not competent to testify as to a gift, because the wife was insane. At the expense of brevity we have quoted at length all that was said in the two objections. This because the latter purports to just renew the previous objection and adds the general statement: "It is not competent." No reason suggested anywhere as to why not competent. The general objection, "It is not competent," amounts to no objection. We need not cite cases upon this question. We cite, however, some cases in point: Adair v. Mette, 156 Mo. l.c. 506-7; Lumber Co. v. Rogers, 145 Mo. l.c. 449, Point III in the opinion.
Even here the pronoun "it" is used, which makes the objection go to the competency of the evidence, and not to the competency of the witness. Evidence as to the *Page 127 
gift was competent, provided the witness was competent to testify as to that matter. The foregoing should, and does dispose of this contention, but there is another reason assigned by the court below, which we will notice.
From what we have quoted, supra, it appears that the trial court based his ruling upon the fact that the opposing side in the probate court counsel for defendant examined McMenamy as to his indebtedness to the estate, including the gift, and having done so, they had waved the incompetency to testify. The trial judge cites Imboden v. Trust Company, 111 Mo. App. l.c. 232, where the question of such a waiver is fully discussed, and the sundry cases reviewed. The trial court proceeded upon the theory that this testimony was at the insanity hearing, but the record is not clear upon that point. The insane wife was interested in two pieces of real estate. Her father gave her the Wash Street property for life, with remainder to her children. In about 1895 she and her brother Richard bought what is known as the Twenty-second Street property. They paid $50,000 for it, but gave back deeds of trust aggregating $20,000. They each paid a half of the price, and each owned a half interest. It appears that for Mrs. McMenamy's half her husband, defendant herein, used $5,000 of the wife's money, and $10,000 of his own, if there was a valid gift, for he used $10,000 of the money given to him by the wife, evidently intending to reimburse himself out of the rents and profits. He did pay off the indebtedness out of the rents, also repairs and all other expenses incident. For years he handled the rents for Richard O'Neil, her brother. Shortly before the insanity proceeding, McMenamy in the name of himself and wife, brought a partition suit against O'Neill. There seems to have been friction before this, however, as between the two. O'Neil followed with the insanity proceeding, filing the affidavit therefor, and without notice to McMenamy. The record shows this witness, O'Neil, in the present action, as saying in substance the following: *Page 128 
"Witness testified that he was present at the insanity hearing in the probate court when his sister was adjudged insane; that Mr. John McMenamy was not there; that witness did not say anything to John McMenamy about his intention to file information; that between the 23rd of July, when information was filed, and the 6th day of August, when the hearing was had, witness did not give any notice to John McMenamy that his wife was to be tried for her sanity; that he filed information because he didn't want his estate to disappear."
So according to this witness the questioning of John McMenamy must have been at a later date. The record shows that the appointment of the two guardians was by an agreement, under which Kane was to retire when an accounting had been made. McMenamy says that he appeared in response to a citation or summons. [See quotation from the record, supra.] The record shows no citation for him to appear, except the one to show cause as to why he should not be removed. McMenamy's testimony is further given, thus:
"Witness further testified that when his wife was adjudged of unsound mind in the probate court he did not receive any notice of the filing of any information against her. The first he heard about it was on a Thursday, when he was notified to go immediately to the probate court for a hearing; that he went there and they put him on the stand and told him they cited his wife as insane, without any notice to him whatever; they didn't give me a notice; that they accused witness of different things, and then asked him who built the house twenty-five years ago; that he was bewildered and did not know where he stood; that he didn't have a chance to talk; that he did not know she was being put into the insane asylum; that he was called as a witness on that occasion and put on the stand by Judge Holtcamp, and examined by Judge Holtcamp and John S. Leahy and William Ford Thompson. Witness testified they asked when he built the house on Lindell and what he did with *Page 129 the money he had received from his wife and such questions as that; that he couldn't answer anything then, and they thought that he was guilty because he couldn't answer.
"Witness testified that he was sworn when he was put on the stand by Judge Holtcamp and examined about the house on Lindell Avenue about the money. Questions were put to him by Judge Holtcamp, Mr. Leahy and Mr. Thompson, but it was impossible for him to think in a few minutes how he built the house on Lindell Avenue twenty-five years ago and upon a few moments' notice to give all that testimony; that Mr. Leahy examined him and thought that he was keeping things back."
O'Neill testifies both ways on the subject if the record is properly abstracted. Thus the record says: "That he was in the probate court at the time John McMenamy was interrogated by Judge Holtcamp; that at that time nothing was said of any gift of $24,000 to John McMenamy; the inquiry at that time was with reference to the Lindell Avenue property; that McMenamy was asked at that time in whose name that property was, his or his wife's; that McMenamy seemed to have a bad case of stage fright at that time; witness could not recall what McMenamy said with referenceto the $22,000 that he was interrogated about at that time."
There was no $22,000 item, and this last portion clearly has reference to the gift of $24,000. So even O'Neill finally admits that this gift was gone into in the probate court. The Lindell Avenue property was John McMenamy's in his own right, as is clearly shown by the record. The trial court was right in his ruling to the effect that his incompetence had been waived. [Imboden v. Trust Co., supra, and cases therein cited.] However, what we first said, as to the insufficiency of the objection settles the matter. Even if it were ruled that McMenamy was incompetent to testify as to the gift, the error would be harmless, as the proof of what happened at the time is sustained by other uncontradicted evidence. [Gibbs v. Haughowout,207 Mo. 384.] *Page 130 
IV. It is also contended that the gift was not in writing. This we covered in the opinion, but will add that $7,500 was by check to John McMenamy by Angela McMenamy. The other portions were in notes from the wife's father given to him by others, and evidently had to be endorsed over to the wife, andParole Gift by her to the husband. But aside from this the replyof Wife to of appellant made no such issue. The reply is setHusband. out in our original opinion, and speaks for itself. No claim is made in that instrument of the character urged in the briefs. Absent such a plea the question is not here. Not only is it a fact that the pleadings do not raise the question, but there is not an objection to the oral testimony as to this gift, in the record. The instructions upon the question of the gift were not objected to at the trial, as we have said. No instruction was asked by defendant below. Thus the question now urged was not the trial theory action.
The gift was at Christmas, 1894, and therefore after the Married Woman's Act, which made the wife a feme sole as to the disposition of her separate estate. [R.S. 1919, sec. 7323; R.S. 1889, sec. 6864.]
The first motion for new trial did not raise the point, but it seems to have been a second thought couched in an amended motion. Since 1889, the wife, with the statutory rights and powers of afeme sole, had the full power to make contracts. Not only so, but she could contract with her husband. We really should not discuss this particular question, because what we have said, supra, disposes of the contention of appellant. The question was not in the case below, and cannot well be here now. Appellant is bound by his trial theory. A few words, however, may not be out of place.
Since the new Act of 1889 (R.S. 1889, sec. 6864) no ruling of our court has held a gift from the wife to the husband, void because not in writing. By this law (now Sec. 7323, R.S. 1919) she was given the powers and rights of a feme sole. Under this statute she can contract *Page 131 
with her husband, and can sue her husband, as if they were not married. Sections 7323 and 7328 must be construed together, because the former section came into the married woman's law long after the substantial part of Section 7328 was the law. This Section 7328 was originally enacted in 1875. [Laws 1875, p. 61.] It was amended in 1883. [Laws 1883, p. 113.]
The only additional amendment was in 1895, and it added the last proviso to the present section as it appears in Revised Statutes 1919. The proviso added by the Act of 1875 reads:
"Provided, That said personal property shall not be deemed to have been reduced to possession by the husband by his use, occupancy, care or protection thereof, but the same shall remain her separate property, unless by the terms of said assent, in writing, full authority shall have been given by the wife to the husband to sell, encumber or otherwise dispose of the same for his own use and benefit; but such property shall be subject to execution for the payment of the debts of the wife contracted before marriage."
For the first time we have the appearance of the words "assent in writing" and the assent thus used is limited "to sell, encumber, or otherwise dispose of the same for his own use and benefit." The writing required therefore was one of limited character. It refers solely to the disposition mentioned by the husband of the wife's property. It might be said to have no reference to gifts. But Section 7323, Revised Statutes 1919, came in this married woman's law in 1889, long after the Act of 1875, and its amendment in 1883, mentioned supra. By the law of 1889 the married woman was given the right of a feme sole, as to her separate property either personal or real. A feme sole could make a gift just as Mrs. McMenamy did. In 1894, she possessed the right of a feme sole. She could contract with her husband as to her property; why could she not make a gift? She could sell the property to her husband; why not the power to give? Does not this law of 1889 (now Sec. 7323, R. *Page 132 
132 So. 1919) give full power to dispose of her property in any way she sees fit? It occurs to us, when you read together these two sections, remembering that Act of 1889 is the later law, and would repeal, by implication at least, all conflicting parts of the previous law. But in view of the first portion of this paragraph of our opinion, such ruling is not really necessary. But we cannot refrain from adding just a little to the subject. Thus in 12 Ruling Case Law, page 926, it is said:
"At common law a woman has no right to make a gift to a person other than her husband without her husband's consent, in the absence of an ante-nuptial agreement giving her the right to dispose of her property as a feme sole. This right to make such a gift is entirely a matter of statutory privilege, and statutes giving a married woman the right to dispose of her personal property have been construed as authorizing her to make giftsinter vivos and causa mortis."
The author is discussing gifts by a married woman. A married woman under statutes such as our law of 1889, giving to a married woman the power to dispose of her property as a feme sole could do, cover a gift inter vivos, as is the gift here. [Vosburg v. Mallory, 155 Iowa 165 — last portion of such opinion. See also note upon said case in 33 Annotated Cases, l.c. 884-5.] Even by ante-nuptial contract which reserved the right to contract and dispose of her property, a gift from such a married woman, by virtue of the ante-nuptial agreement, she had the right to make a gift of her property. [Williamson v. Yager, 91 Ky. 282.] In the note in Vosburg's case, supra, it is said:
"In Williamson v. Yager, 91 Ky. 282, 15 S.W. 660, 13 Ky. L. Rep. 273, 34 Am. St. 184, it appeared that a wife, by virtue of the power vested in her by an ante-nuptial contract, disposed of her personalty by gift. The court said: `It is true that ordinarily coverture destroys the wife's legal identity, and renders void any contract she may make, and a gift by a married woman being a contract, it is likewise void. But it is equally *Page 133 
true that by an ante-nuptial contract the wife may retain her legal right to contract and dispose of her property as a femesole."
We shall go no further. A feme sole could make a gift intervivos by mere delivery of her property to the party. Under our statute a married woman has the same power and right.
V. Learned counsel insist that the trial court erred in refusing to permit counsel to cross-examine McMenamy as to an inventory which he had filed. He had been previously asked if his books did not show that he had collected rents on the Twenty-second Street property, in the amount of $87,478.07, and had expended for improvements, rents, taxes and fees for collection $48,858.23. The witness had answered that he supposed that his books did show that. He also said that he had not paid such sum to the guardian of the estate. We presume counsel meant Dr. Kane, and in this case McMenamy is contesting his right to be such guardian. Taking the inventory in his hand counsel thus proceeded:
"Q. Now, I see that on October 10, 1918, you filed what you call your first statement; is that your signature (shows to witness)? A. I believe so; yes.
"Q. Just hold that in your hand. Let me have the inventory. (Witness does as requested.) Now, you testify here to-day that your books show at the time the accountant made the examination that there was $38,619.84 due Angela McMenamy from the Twenty-second Street property, and you testify that there was $6,923.19 due Angela McMenamy from the Wash Street property; where do either of those amounts appear in that statement you filed?
"This question was objected to by counsel for John McMenamy as not being within the issue; which objection was sustained; to which ruling of the court exceptions were duly saved by counsel for R. Emmet Kane."
This property was jointly owned by Mrs. McMenamy and Richard O'Neil, her brother. Witness had not testified that his books showed, or that he supposed that *Page 134 
they showed, that he had collected such sum for Mrs. McMenamy, or that he had paid out such sum for her. The evidence does show that he collected for both the wife and her brother during all these years.
McMenamy filed an inventory, without being ordered to so do, and in it he gave all the real estate in which his wife had an interest. It was delayed, as the record shows, by a futile attempt of the parties for some months to agree as to what should go into it. As to the personal property this inventory shows:
"Net amount of cash from rents collected on property on Twenty-second Street, Morgan and Lucas Avenue, after payment of expenses for repairs, commissions, interest paid on loan and payment of principal debt, from May 29, 1895, to February 8, 1918, $11,960.85. Net amount of cash from rents collected on Wash Street property, after payment of expenses for repairs and commissions, $7,084.71; making total, $19,045.56."
It accords with the ninth and tenth clauses of his answer filed in the circuit court, in which he says that he paid his wife's portion of the debt of $20,000 against property, as well as taxes, repairs and other expenses. As to rents he does not deny liability or claim them as his own. He never claimed the rents as his own, so far as this record shows. The net amount was a matter of contention, but he chief contention was the $24,000 gift. This is the only item wherein he was claiming property adverse to the estate. Whether or not his inventory is a correct one is for the probate court to determine in the first instance. But the trial court held that this inquiry as to the inventory was not within the issues, and this brings us to the petition for removal. The statute (Sec. 492, R.S. 1919) says: "The several probate courts shall have power to remove such guardians at any time for neglect of duty, misconduct or mismanagement, or disobedience to any lawful order, and appoint others."
In State ex rel. v. Bird, 253 Mo. l.c. 581, it is specifically ruled that a removal can only be had upon some statutory ground. McMenamy had disobeyed no lawful *Page 135 
order of the probate court, because the court (so far as this record shows) made no order until the removal order was made. The delay in filing the inventory (which, with the first annual settlement, is in the record) was satisfactorily explained by the record, and upon this satisfactory evidence the effect of the judgment is in favor of McMenamy upon this point.
But to the petition of removal in this case. First, it charges that McMenamy received $36,798.62 from her father's estate, which he has had in his possession since 1896. The petition is set out in full in our original opinion and we shall not repeat. But following this charge is a recitation of things "that the said John McMenamy has stated" or that "the said McMenamy has further stated." The petition does not charge as a fact that McMenamy had done and received the things, which the petition avers that he spoke of as above mentioned. In other words, there is no averment that McMenamy was claiming these rents as his own, and thereby claiming property adversely to the estate. The petition concludes:
"That when an endeavor was made to have the said John McMenamy account for the $22,000 received by the said Angela McMenamy in addition to the above amounts from the estate of her father, he declined to make any statement except to say that the matter was of no concern to the representative of your petitioner; that other attempts have been made to secure an accounting from the said McMenamy, but in vain.
"Wherefore, your petitioner prays that the said John McMenamy be cited to appear before your Honor and to show cause why he should not be removed as guardian of the said Angela McMenamy,n.c.m."
There is no charge in this petition that the $22,000 (should be $24,000) was being claimed adversely. Counsel invoke aider by answer, and in the answer McMenamy does make claim to this $24,000 as a gift, and in his answer and by his evidence fully shows where all the $36,798.62 from the wife's father's estate went. He has never claimed the rents as his own, and the only difference *Page 136 
there is as to the net amounts owing. In this situation the appellant filed his reply, raising the questions of no gift, and if a gift, that it was invalid because the wife was insane at the time.
Now comes the real picture of the case. Appellant put on one Morman S. Bliss, an accountant, who had examined as to this item of $36,798.62 from the father's estate. After the witness showed himself to be an accountant, and that he began an investigation to see what became of it, the following occurred:
"THE COURT: It looks to me from the standpoint of these pleadings that the co-guardian has the burden of establishing this gift, and it is up to the co-guardian to establish this gift of $24,000; that is the state of the case, so you can withdraw that witness and put him on after Mr. McMenamy.
"MR. LEAHY: Now, does your Honor hold that under the pleadings the burden is on Mr. McMenamy?
"THE COURT: I am so ruling."
To this action of the court, which was a construction of the pleadings and the issues, no objection was made or exception saved, and thereupon the validity of this gift was the sole issue. This is the only thing claimed by McMenamy as his own. McMenamy accounted for this $36,798.62 in his evidence, and this included the gift. He so pleaded in his answer. Bliss was never recalled, and the whole record is one over the validity of that gift. The appellant adopted the court's theory of the issues, without objections or exceptions, and three days were given to the trial thereof. The effort to show that the inventory was inaccurate was not within the issues adopted in the trial, or any other valid issue in the case. McMenamy never claimed that the net rents were his, or that any portion thereof was his property, and hence there was no adverse claim in this regard. The petitioner does not charge that he claimed the rents as his own. The issue tried was the gift of $24,000, and we reiterate that such course was pursued by the court without objection by counsel, and thereby with their tacit consent. *Page 137 
We say again, as we said in the original opinion, that had the trial court's judgment (in this trial anew, upon the issues made) ousted McMenamy, then such judgment could be successfully pleaded as res adjudicata, if McMenamy were sued for the $24,000, and he undertook to defend upon the theory of a gift. It would stand as an adjudicated fact against him. The only adverse claim was this $24,000 as the trial court saw from the pleadings, and absent this claim, no statutory ground for removal was pleaded — even by aider of answer.
The motion for new trial should be overruled. All concur.Atwood, J., withdraws his dissent to the original opinion, and desires to, and is, marked as concurring therein.