EDWARD SNYDER v. AMERICAN CAR & FOUNDRY COMPANY, Appellant. —14 S. W. (2d) 603.

Division Two, March, 2, 1929.

148

*Watts & Gentry* for appellant; *G. A. Orth* of counsel.

*Douglass & Inman* for respondent.

HENWOOD, C.—This is an action for damages, in which Edward Snyder, plaintiff below, obtained a verdict in the sum of $15,000, for personal injuries suffered by him while employed by the defendant company. By an order of *remittitur*, with which plaintiff complied, his award of damages was reduced to $9,000, and, from the judgment for that amount, an appeal to this court has been perfected. (Two of the defendant company's foremen, Alfred Wenchel and Joseph Kellerhouse, were originally joined as defendants, but the trial court directed a verdict in their favor).

Plaintiff was employed as a painter at defendant's plant, in St. Charles, Missouri, where he had worked for seventeen years. The plant consisted of various buildings, shops, tracks, and other equipments, used in the manufacture of railroad cars. According to his testimony, plaintiff worked under the directions of Wenchel, a foreman of the paint department, and Rodgers, another employee of

defendant, worked under the directions of Kellerhouse, a foreman of a different department, the wood department. The steel track extended north and south along the east side of the steel plant and the machine shop. The machine shop was some distance south of the steel plant, and, between these two buildings, there was a transfer table, by which cars and wheels were transferred from the steel track to other tracks, extending east and west, and *vice versa*. The shipping track, immediately east of the steel track and parallel thereto, was about four or five inches higher than the steel track, and the inside rails of the two tracks were about six feet apart. Plaintiff thus indicated the relative location of these buildings and tracks and the transfer table by referring to two photographs (Plaintiff's Exhibits A & B).

On the morning of September 18, 1923, Wenchel directed plaintiff to "touch up" a refrigerator car which was standing on the shipping track, near the south end of the steel plant, and about eighty feet north of the machine shop. After painting some iron on the signal hose and air hose, and one place on the bottom of the car, he started to work on the side of the car next to the steel track, removing some black paint which had run down from the tin roof to the letter board, and retouching the name "Northern Pacific" on the letter board. The sides of the car extended out two feet from the rails. The roof extended out three inches more, and was fourteen feet high. He was using a ladder, sixteen feet long, with the upper end leaning against the roof of the car, and the lower end resting upon the ground, about five or six inches from the inside rail of the steel track. He said: "I put my ladder as far away from the track (steel track) as I could to be safe. If I had moved my ladder any further away from the track (steel track), it would have been almost straight up. After looking both north and south before I got on the ladder, I did not look any more after I got up. When I got up on the ladder, I did not see any wheels on the track or any person around there. I did not know they were going to put wheels on the track. *Nobody had said anything to me about it or give me any notice or warning.* I would not have placed my ladder there if I had known that the wheels were going to be rolled on the steel track. Warnings were generally given when flat cars were rolled out on that track, though I have seen them rolled out there without any warning. *They are supposed to warn you. If anybody is working there, they are supposed to give a signal of some kind.* Nobody ever did warn me that day or any other day. I was out there lots of times before and they never gave any warnings. I never did see or hear of their warning anybody out there, in the whole seventeen years that I worked there. I was once working under a car there and a switch engine moved the car over me without warning. I knew they moved cars

without warning, and that was the reason I looked up and down the track for myself." While plaintiff was standing on the ladder, about eight feet from the ground, and working on the side of the car, as above mentioned, Rodgers rolled a pair of car wheels on the steel track, from a point about seventy-five feet south, and the journal (or axle extension) of the east wheel struck and knocked down the ladder, causing plaintiff to fall "straight down" on his feet, and to suffer the injuries herein complained of. The journals (or axle extensions) on these wheels were eleven inches long. Plaintiff had been on the ladder about fifteen minutes before Rodgers came along with the wheels, and he and the ladder were in plain view of any person on the steel track, north or south, for a distance of fifty feet. He was injured "sometime between eleven and eleven-thirty in the forenoon." While sitting on the ground, immediately after he fell from the ladder, he said to Rodgers: "Rodgers, you ought to of been able to see me up there;" and Rodgers said: "I seen the ladder, but it was too late." There was a concrete abutment under the ladder, but plaintiff was unable to say whether or not his feet struck this abutment when he fell. He did not see either Rodgers or Kellerhouse on that day, before he was hurt. And he had never seen any wheels rolled on the steel track before.

Concerning his injuries, plaintiff said: "I was confined to bed between three and four months and was then on crutches about three months. After that I used a cane, which I still use. I had awful pain in my heels. The doctor came to see me every day for awhile, between two and two and one-half months. During that time I suffered intense pain. I could not sleep at night on account of the pain in my heels. The pain in my heels still continues when I walk. Before I fell from the ladder, my general physical condition was good, including my feet. I have been unable to work since I was injured." ' He was earning $8 per day in wages at the time he was injured (September 18, 1923), and was forty-three years old at the time of the trial, in March, 1925.

Dr. Gray Briggs, X-ray specialist, took X-ray pictures of plaintiff's feet and ankles on June 27, 1924. Referring to these pictures he testified as follows: "They show that there has been a fracture of the os calcis or heel bones in both feet. They also show arthritis, that is, inflammation of the joint between the heel bone and the cuboid bone in the right foot, and both heel bones are compressed. There has been a comminuted fracture in both heel bones; they showed indication of fracture, and there was some falling of the arches as the result of that. This compression of the bone is, of course, permanent. They are not going to build up any more. The bones are battered, flattened in that shape (illustrating), and it is going to remain."

Dr. D. C. Todd, who treated plaintiff in June, 1924, said: "The ankles are inverted or turned inward, the arch is dropped and there is limited motion." He further said that these injuries were both permanent and progressive, and that they would necessarily cause pain and discomfort.

Dr. Robert E. Schlueter, at the request of defendant's counsel and with the consent of plaintiff's counsel, examined plaintiff a few days before the trial. Both in his written report and as a witness for defendant, he stated that he found no evidence of fracture, dislocation, nor any other injury; that plaintiff was suffering from anaesthesia, or loss of the sense of feeling, in both legs, caused by sclerosis, or hardening of some portions of the spinal cord; that such affliction is incurable and definitely progressive, and, in his opinion, could not be caused by an injury.

Dr. H. W. Hoge, nerve specialist, who examined plaintiff during the trial, testified in rebuttal for plaintiff. He said: "W⌐ naturally find, and probably do find more diseases affecting the spinal cord in one way or another than we do find that condition in persons who have had their spinal cord injured in an accident, but it is a common every-day occurrence to find just the same symptoms resulting from physical injuries to the spinal cord as we find resulting from disease." He also said that, in his opinion, a fall with enough force to break both heel bones would be sufficient to cause the condition in plaintiff's spinal cord, as described by Dr. Schlueter.

John W. Lawler, defendant's district manager, testified, for defendant, that he saw plaintiff frequently, before the trial, walking with a cane on the streets of St. Charles. Referring to such occasions, he said: "He walks very good at times, and at other times when he saw me he immediately became more lame."

Alfred P. Petill, a motion picture photographer, testified, for defendant, that, on October 3, 1924, he took a moving picture of plaintiff, while plaintiff was walking with a cane on a public sidewalk in St. Charles, Missouri; that the picture "was taken just like any other motion picture is taken, at regular speed;" that "we figure a foot a second goes through the camera at regular speed;" and that it correctly represents the "natural movements" and "normal motion" of the subjects shown in the picture. This picture was exhibited to the court and jury at the trial, and also to this court, in connection with the oral arguments of counsel in this court.

Both Rodgers and Kellerhouse, "straw boss" over Rodgers, in testifying for defendant, admitted that Kellerhouse directed Rodgers to roll the wheels on the steel track, and that the wheels were rolled toward the north from the machine shop. Kellerhouse further admitted that the car on which plaintiff was working could be seen "all the way from the transfer table." Both Rodgers and Kellerhouse further said that, while they were together shortly before plaintiff

was injured, they had a conversation with plaintiff, in which they told plaintiff they were going to roll wheels on the steel track, and warned him to keep his ladder away from the track. On cross-examination, Kellerhouse said "it was three o'clock in the afternoon" when he notified plaintiff to stay off of the ladder.

In rebuttal, plaintiff offered in evidence a written statement signed by Rodgers before the trial (plaintiff's Exhibit C), in which Rodgers said: "I never saw Snyder before the wheels hit his ladder and I never heard Kellerhouse tell him not to get on the ladder—but Kellerhouse told me that he did tell Snyder not to get on ladder. I never gave any signals because I didn't see Snyder. Kellerhouse didn't say anything about ladder, simply said he had told Snyder that they were rolling wheels and to stay away from car."

Plaintiff also offered in evidence, in rebuttal, the deposition of Edgar Rohlfing, defendant's clerk, in which Rohlfing said that, "right after eleven o'clock," he found plaintiff injured, "sitting alongside the car;" that he assisted in carrying plaintiff to a taxicab; and that he made out a report of the accident in the afternoon. He further said that plaintiff "worked under Wenchel in the coach department," and that Kellerhouse had charge of the "labor gangs in the coach department."

I. Two of the contentions made by defendant may be considered together; first, that "the court erred in permitting the witness, Dr. Gray Briggs, to testify to the *mere possibility* of a  spine injury being caused by such a fall as plaintiff had when he alighted on his feet;" and second, that the court should have sustained defendant's motion to discharge the jury, on the ground that they were prejudiced against defendant by the remarks of counsel and the court relating to the admissibility of this testimony and the right of plaintiff to amend his petition by alleging injury to his central nervous system.

Manifestly, both of these contentions are based upon a misconception of the record. In the first place, the record shows that, while the testimony referred to was originally admitted over defendant's objection, it was later stricken out, upon defendant's motion, on the ground that plaintiff alleged no injury to his spine in his petition. In the second place, defendant did not complain, in its motion for a new trial, of the court's refusal to discharge the jury, and thereby forfeited its right to make such complaint on appeal. [Kirby v. Heaton, 315 Mo. 338, 286 S. W. 76.] Aside from this rule, defendant is not in a position to complain of the action of the trial court in this matter, because it not only offered direct evidence as to the condition of plaintiff's spinal cord, or central nervous system, in the

written report and also in the oral testimony of its own witness, Dr. Schlueter, but cross-examined plaintiff's witnesses, Dr. Todd and Dr. Hoge, at length along that line, in an attempt to prove that the crippled condition of plaintiff's feet was caused by a diseased condition of his spinal cord, and not by injury. Moreover, in defendant's Instruction 7, the jury were told that, in the event they found for the plaintiff, they could not allow him any damages "for any injury to or degeneration of the spinal cord or loss of sensation in his legs." It follows that there is no merit in either of the contentions above mentioned.

II. It is urged that the court erred in overruling defendant's demurrer to the evidence at the close of the whole case. The only reason offered in support of this contention is that "plaintiff, in his petition, bottoms his right of recovery upon the departmental rule," and, having failed to bring his case within that rule, by proving that Rodgers was not his fellow-servant, he is not entitled to recover.

The ultimate charge in the petition is that defendant failed to provide and maintain a reasonably safe place for plaintiff to work. The case was tried and submitted to the jury, by instructions on both sides, upon the issue of defendant's negligence in exposing plaintiff to an unusual danger, without any notice or warning thereof, while he was engaged in the due performance of his duty. And there is nothing in the record to indicate that defendant relied upon the fellow-servant doctrine as a bar to plaintiff's recovery, or that it undertook to raise that question in the court below, either in the development of the facts or in its given or refused instructions. It is elementary that a cause must be heard in the appellate court upon the same theory as that upon which it was tried. [Guthrie v. Gillespie (Mo. Sup.), 6 S. W. (2d) 886; Pienieng v. Wells (Mo. Sup.), 271 S. W. 62; Kane v. McMenamy, 307 Mo. 98, 270 S. W. 662; St. Louis v. Wright Contracting Co., 210 Mo. 491, 109 S. W. 6.] However, it is immaterial, under the undisputed facts in this case, whether or not Rodgers was ordinarily a fellow-servant of plaintiff. It is not disputed that plaintiff was directed by defendant, through its foreman, Wenchel, to finish the job of painting the car which stood on the shipping track, and that it was necessary for him to stand on a ladder, with his back toward the steel track, while engaged in doing that work. And it is admitted, by both Kellerhouse and Rodgers, that Rodgers was directed by defendant, through its foreman, Kellerhouse, to roll the wheels on the steel track, while plaintiff was so engaged. It was defendant's duty to exercise ordinary care to keep plaintiff's place of work reasonably safe, and that duty was a non-delegable one. The work Rodgers was directed to do affected the security of the place where plaintiff was directed to work,

and it was defendant's duty to see that Rodgers did not perform said work in a negligent manner. There is substantial evidence tending to show that Rodgers was negligent in performing said work, in failing to warn plaintiff of the danger incident thereto, and for that negligence defendant is liable. The demurrer to the evidence was, therefore, properly overruled. [Bender v. Kroger Grocery Co., 310 Mo. 488, 276 S. W. 405; Koerner v. St. Louis Car Co., 209 Mo 141, 107 S. W. 481; McNulty v. Atlas Portland Cement Co. (Mo. App.), 249 S. W. 730; Chulick v. American Car & Foundry Co. (Mo. App.), 199 S. W. 437.]

III. Defendant challenges plaintiff's main instruction (No. 3) solely and only on the ground that it authorized a verdict for plaintiff without requiring the jury to find that Rodgers and plaintiff were not fellow-servants. Our conclusion on the demurrer to the evidence necessarily disposes of this contention. As we have already said, in substance, the negligent act of Rodgers, which caused plaintiff's injuries, was the negligent act of defendant, in failing to exercise ordinary care to keep plaintiff's place of work reasonably safe. And plaintiff having made a case for the jury on that theory, it was not necessary for the jury to determine, nor is it necessary for us to decide, whether or not plaintiff and Rodgers were fellow-servants when engaged in performing the usual and ordinary duties of their employment. It is significant that defendant not only combated plaintiff, at the trial of this case, upon the theory of recovery above mentioned, but did not even request an instruction by which it sought to invoke the fellow-servant rule as a bar to plaintiff's recovery.

IV. Finally, it is argued that the judgment is excessive. This argument is not persuasive. The testimony of defendant's district manager, Mr. Lawler, that he had seen plaintiff walking "a great deal" after he was injured, and that "he walks very good at times, and at other times when he saw me he immediately became more lame," was for the jury to consider in connection with all of the other facts and circumstances in evidence, relating to the nature and extent of plaintiff's injuries; likewise, the moving picture of plaintiff, exhibited at the trial and also before this court, which shows plaintiff, though using a cane, walking at a rapid gait and without much impediment. In our opinion, this picture might cause a spectator to underestimate plaintiff's injuries in his feet and ankles, and what is commonly known as a slow motion picture, taken under the same circumstance, might cause a spectator to overestimate his injuries. Perhaps the jury were so impressed. Considering plaintiff's age and the evidence tending to show that he is permanently crippled in his feet and ankles, that he suffered much pain, and lost $8 per day in wages, from September 18, 1923, up to the time of

158

the trial, in March, 1925, as the result of his injuries, and that his earning capacity is permanently impaired, it certainly would not be fair and reasonable for this court to say that the judgment of $9,000 is excessive. Indeed, we have upheld larger judgments, based upon similar injuries, facts and figures. [Ernst v. Ry. Co., 256 S. W. 222; Spencer v. Railroad Co., 297 S. W. 353; Jordan v. Ry. Co., 308 Mo. 31, 271 S. W. 997.] See also the case of Dees v. Const. Co., 8 S. W. (2d) l. c. 878, and cases therein cited.

In accordance with the conclusions above stated, the judgment is affirmed. *Higbee* and *Davis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.